24CA0996 Ironshore v Pool 04-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0996
Adams County District Court No. 22CV30798
Honorable Arturo G. Hernandez, Judge

---

Ironshore Specialty Insurance Company, an Arizona corporation, as subrogee of Brinkman Construction, Inc.,

Plaintiff-Appellant,

v.

Pool and Spa Company, a Colorado limited liability company,

Defendant-Appellee.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE KUHN
Welling and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 24, 2025

---

Nicolaides Fink Thorpe Michaelides Sullivan, LLP, Matthew J. Fink, Denver, Colorado; Michael A. Yanof, Dallas, Texas, for Plaintiff-Appellant

Tyson & Mendes LLP, Michael D. Drews, Greenwood Village, Colorado, for Defendant-Appellee

¶ 1      Plaintiff, Ironshore Specialty Insurance Company, appeals the trial court's judgment entered upon jury verdicts in favor of defendant, Pool and Spa Company (Pool & Spa), on Ironshore's breach of contract and negligence claims.  We affirm.

## I.      Background

¶ 2      We glean the following factual and procedural background from the record and evidence the jury heard at trial.

¶ 3      This construction defect dispute concerns the development of a hotel in Westminster, Colorado.  In 2019, the hotel's owner, Marriott International, hired Brinkman Construction, Inc., to serve as the general contractor for the project.  A few months later, Pool & Spa entered into a subcontract with Brinkman, in which it agreed to design and build an outdoor swimming pool and spa in the hotel's courtyard for $160,500.  Pool & Spa began working on the project in April 2020 after obtaining all the necessary approvals from Brinkman and its architect, Worth Group Architects and Designers.  In July of that year, Pool & Spa completed the installation of the pool and spa, the structures passed a final inspection, and Pool & Spa requested payment of $35,000, the outstanding contract balance.

1

¶ 4    Brinkman rejected the payment request.  Instead, it informed Pool & Spa that it was terminating the contract because the structures contained numerous material defects that Pool & Spa had failed to correct.  Specifically, the termination letter alleged that Pool & Spa, among other things, hadn't properly installed the coping and handrails and had failed to install "auto fill components" and a "chemical feeder" for the pool.

¶ 5    Roughly two months later, in November, Brinkman sent Pool & Spa notice of claim under section 13-20-803.5, C.R.S. 2024. In addition to the previously identified defects, and as relevant on appeal, Brinkman alleged that Pool & Spa and Pool & Spa's subcontractor had failed to design and install a leak collection system that a civil engineering company, Kumar & Associates, had recommended in a 2017 geotechnical soils report (the Kumar report).  Brinkman alleged that the defects in Pool & Spa's workmanship "ha[d] led to water leaks, potential safety issues, and surrounding soils movement."  Considering the nature of the alleged defects, Brinkman asserted that "the only workable solution [was] to demolish, remove and replace the swimming pool in its entirety."  After Pool & Spa denied liability for the claimed defects,

Brinkman paid approximately $647,000 to replace the pool, the spa, and the surrounding concrete pool deck.

¶ 6     In June 2022, Brinkman and its insurer, Ironshore, sued Pool & Spa.  About seven months later, Ironshore paid Brinkman roughly $540,000 under its policy in exchange for a release of any claims relating to the pool project.  Then, as Brinkman's subrogee, Ironshore filed an amended complaint and asserted against Pool & Spa claims for general breach of contract, breach of the indemnity clause in article 9.1.1 of the contract, negligence, and professional negligence.  In the meantime, Pool & Spa filed a third-party complaint against several entities that had participated in the project, including Worth Group and Aquatic Engineering Consultants, LLC (AEC), the subcontractor that Pool & Spa had hired to design the pool and spa.  The trial court eventually dismissed the third-party defendants from the suit, and Ironshore's claims against Pool & Spa proceeded to a six-day jury trial.[1]

---

[1] Specifically, Pool & Spa stipulated to AEC's dismissal from the case before trial.  It also settled with Worth Group, which Pool & Spa designated as a nonparty at fault shortly before trial.

¶ 7    The jury returned special verdicts finding that (1) Pool & Spa breached the pool contract with Brinkman, but Brinkman failed to substantially perform its obligations under that contract; (2) Pool & Spa didn't breach the indemnification clause; (3) Brinkman and Pool & Spa were both negligent; (4) Pool & Spa was 15% at fault for Brinkman's damages and Brinkman was 85% at fault; and (5) Ironshore wasn't entitled to any damages on its claims. Consequently, the trial court entered judgment in favor of Pool & Spa.

## II.    Analysis

¶ 8    On appeal, Ironshore contends that the trial court reversibly erred by entering judgment on the jury's special verdicts because the evidence was insufficient to support the jury's findings that Brinkman (1) breached the contract with Pool & Spa and (2) was 85% negligent.  Ironshore also contends that the jury erred by finding that (3) Pool & Spa didn't breach the indemnity clause in the contract, and (4) Ironshore wasn't entitled to recover any damages because the evidence was insufficient to support those findings and the findings were inconsistent with other aspects of the jury's

4

verdicts. We set forth the applicable standard of review before addressing each of Ironshore's contentions.

### A. Standard of Review

¶ 9 We review sufficiency of the evidence claims de novo.[2] *Northstar Project Mgmt., Inc. v. DLR Grp., Inc.*, 2013 CO 12, ¶ 14. In doing so, "we must determine whether the evidence, viewed as a whole and in the light most favorable to the prevailing party, is sufficient to support the verdict." *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1106 (Colo. App. 2004). We also must "draw every reasonable inference from the evidence in favor of [the prevailing]

---

[2] Pool & Spa contends that "[s]ufficiency of the evidence to support a jury's finding is not a question of law reviewed [de novo]." In support of its position, Pool & Spa appears to argue that de novo review only applies when a sufficiency of the evidence claim relates to an underlying question of law. This argument misses the mark. *See Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005). Our sufficiency review doesn't turn on whether the underlying issue is one of law or fact because we don't review de novo the jury's ultimate conclusion. *See Mince v. Butters*, 616 P.2d 127, 129 (Colo. 1980) (noting that while the sufficiency of the evidence in awarding damages is a question of law, whether to award those damages lies in the discretion of the trier of fact). Instead, as the supreme court has observed, we merely "review *all* of the relevant evidence de novo in the light most favorable to the verdict" to decide whether it sufficiently supported the jury's decision. *Northstar Project Mgmt., Inc. v. DLR Grp., Inc.,* 2013 CO 12, ¶ 14.

party." *Averyt v. Wal-Mart Stores, Inc.*, 2013 COA 10, ¶ 18 (quoting *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1201 (Colo. App. 2009)). It is the sole prerogative of the jury to resolve disputes of fact and to determine the weight of the evidence, the inferences to be drawn from it, and the credibility of the witnesses. *Fisher v. State Farm Mut. Auto. Ins. Co.*, 2015 COA 57, ¶ 40, *aff'd*, 2018 CO 39. Accordingly, we won't disturb a jury's verdict if there is competent evidence in the record to support it, even if reasonable people could reach a different conclusion based on the same facts. *Id.*; *see also People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

¶ 10 Likewise, we won't reverse a jury's verdict for inconsistency when the jury has been adequately instructed on the law and the verdict is supported by sufficient competent evidence in the record. *Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242, 1259 (Colo. 1994). We review the jury instructions, the jury verdict forms, and the evidence presented at trial to answer this question. *Id.*; *see also Hall v. Frankel*, 190 P.3d 852, 863 (Colo. App. 2008). "If there is a view of the case that makes the jury's verdict consistent, we have a duty to reconcile the verdict in that way." *Hall*, 190 P.3d at 863.

### B. Ironshore's Sufficiency Challenge to the General Breach of Contract Verdict

¶ 11    Ironshore contends that there was insufficient evidence supporting the jury's finding that Brinkman also breached the pool contract, which means its ultimate conclusion that Ironshore therefore couldn't prevail on its general breach of contract claim is also unsupported.  We disagree.

### 1.    Applicable Law

¶ 12    To prove a breach of contract, a plaintiff must show (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.  *Univ. of Denver v. Doe*, 2024 CO 27, ¶ 46.

¶ 13    "The 'performance' element in a breach of contract action means 'substantial' performance."  *McDonald v. Zions First Nat'l Bank, N.A.*, 2015 COA 29, ¶ 50 (quoting *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).  "A party has substantially performed when the other party has substantially received the expected benefit of the contract" and is therefore bound to pay the contract price to the performing party.  *Stan Clauson Assocs., Inc. v.*

*Coleman Bros. Constr., LLC*, 2013 COA 7, ¶ 9; *Diodosio*, 841 P.2d at 1058. "Failure to substantially perform constitutes a breach of contract." *Stan Clauson Assocs., Inc.*, ¶ 9.

> 2. There Was Sufficient Evidence to Support the Jury's Finding that Brinkman Failed to Substantially Perform the Contract

¶ 14    The parties' dispute at trial centered around the uncontroverted fact that Pool & Spa didn't design and install the leak collection system that the Kumar report had recommended. The report stated that because of expansive soils at the project site, "[t]he pool should include a leak collection system to reduce the potential for leak-induced post-construction heave." The contract between Brinkman and Pool & Spa didn't include the quoted language or explicitly state that the pool must be equipped with the recommended system. Instead, article 13 of the contract incorporated several other documents by reference, including the Kumar report. The contract included as an exhibit the cover page of the Kumar report but not the remainder of the document. The contract noted that the "[f]ull report [was] available in Sharefile" and that "[a] link w[ould] be provided with the Subcontract Agreement."

¶ 15    Ironshore argued at trial that because the Kumar report recommended a leak collection system, and that report was referenced in the contract, Pool & Spa breached the contract by failing to design and install the leak collection system underneath the pool, or to at least confirm with Brinkman whether it was expecting the pool to have such a system.  That failure, Ironshore contended, led to the build-up of leaking pool water in the expansive subsoils, which, in turn, caused the pool and the surrounding concrete deck to shift.  As a result of these defects, Brinkman had to spend roughly $647,000 on demolishing and replacing the pool, spa, and concrete deck.  And because the costs associated with this corrective work exceeded the unpaid balance of the contract price, Ironshore's position was that Brinkman properly withheld final payment in accordance with the contract's plain terms.

¶ 16    For its part, Pool & Spa didn't dispute that its contract with Brinkman referenced the Kumar report and that the pool it built lacked the leak collection system.  Pool & Spa argued that it nonetheless completed all the work that Brinkman had hired it to do because the disputed leak collection system wasn't within the

scope of its work. In support of this argument, Pool & Spa highlighted evidence suggesting that the design and installation of the recommended leak collection system weren't required under the bid request that it had received from Brinkman, its proposal to Brinkman, or the shop drawings that the parties had negotiated and agreed upon. Pool & Spa also highlighted that Brinkman's engineer and Worth Group signed off on the design, which didn't explicitly contain a leak collection system. Finally, Pool & Spa pointed out that Brinkman didn't provide anything more than the first page of the Kumar report until after the pool design had been completed by AEC, approved by Brinkman, and submitted for approval by Worth Group.

¶ 17    The jury ultimately found in favor of Pool & Spa on Ironshore's general breach of contract claim. In a special verdict addressing this claim, the jury answered in the affirmative the following question: "Did the defendant [Pool & Spa] and/or its subcontractors, or anyone employed directly or indirectly by any of them for whose acts any of them may be liable, fail to follow the requirements in the contract between [Brinkman] and [Pool & Spa]." But the jury also answered "No" to the next question: "Did . . .

Brinkman . . . substantially perform its part of the contract." The jury therefore determined that Ironshore didn't prevail on its contract claim against Pool & Spa.

¶ 18    We conclude that there was sufficient evidence supporting the jury's decision.[3] While the contract generally referenced the Kumar report, other evidence in the record suggested that Pool & Spa wasn't responsible for the design and installation of the leak collection system, creating a factual dispute for the jury to resolve. For example, it was undisputed that Brinkman's request for bid and Pool & Spa's proposal — which reflected the eventual contract price and was also incorporated by reference in the contract — didn't list

---

[3] In reaching this conclusion, we note that portions of Pool & Spa's answer brief addressing Ironshore's sufficiency challenges only include a bare laundry list of witnesses and record cites for the testimony purportedly supporting the jury's verdicts. Pool & Spa doesn't discuss the contents of the witnesses' statements in its brief, let alone indicate how they relate to its argument. While Pool & Spa nonetheless prevails on this and other sufficiency challenges raised in this appeal, we caution against this approach. *See* C.A.R. 28(a)(7)(B), (b) (providing that a party's arguments must contain "a clear and concise discussion of the grounds" upon which the party is relying in advancing its position, including proper citations to the authorities and relevant parts of the record); *Brighton Sch. Dist. 27J v. Transamerica Premier Ins. Co.*, 923 P.2d 328, 335 (Colo. App. 1996) (noting that, as the reviewing court, we don't have the duty to search the record for evidence in support of a party's arguments), *aff'd*, 940 P.2d 348 (Colo. 1997).

those services as a separate line item. T.J. Kate, a civil structural engineer who was qualified "as an expert in the fields of civil and forensic engineering and swimming pool contracting," opined that he would have expected Brinkman's bid to include a leak collection system as a separate item because it was "a very specialized kind of thing." Indeed, the owner of Pool & Spa testified that he hadn't installed such a system in the past because that was considered soil mitigation work, an area outside of his and Pool & Spa's expertise. He noted that Pool & Spa "do[es] not do any soil mitigation. Zero. We don't do leak collection systems. We don't overexcavate. We build the swimming pool."

¶ 19    Moreover, Kate and another expert witness, Aaron Bagley,[4] testified that the final shop drawings that AEC prepared on Pool & Spa's behalf didn't contain a design for the leak collection system. The record shows that Brinkman and Worth Group approved those drawings after several rounds of revisions and after engaging in extensive communications with AEC. Kate opined that because the

---

[4] Bagley was qualified as an expert on the standard of care in contract compliance with plans and specifications and the reasonableness of a pool replacement.

drawings didn't include the leak collection system, that feature wasn't part of the plans, specifications, and approved submittals that Pool & Spa was required to follow under the contract:

> Well, the pool and spa, per plans, this was a design-build contract. And the plans were prepared by [Pool & Spa] and its . . . engineer [AEC]. And so those are the plans that [Pool & Spa was] building to, and those are the plans that they bid off of. And those are the plans with their specs that were included as part of those plans. That's what they submitted back to Brinkman and ultimately to the architect to Worth [Group] for approval, and so that becomes the approved submittals.
>
> And so when you look at the plans, specifications and approved submittals, that's what they are. And nowhere in there was there any kind of leak collection system.

¶ 20    Kate further opined that Pool & Spa's work complied with the approved shop drawings and that Pool & Spa completed all the services for which it was hired by Brinkman. And Justin Tuck, Brinkman's former project manager and an expert on "construction management and the standard of care required for [the] design and construction of pools," testified that the contract provision allowing Brinkman to correct defective work and withhold from the contract

13

price the costs associated with that work assumed that the defects were within Pool & Spa's original scope of work.

¶ 21 Viewing this evidence in the light most favorable to Pool & Spa as the prevailing party, a reasonable juror could have concluded that the leak collection system was outside of Pool & Spa's scope of work, and in that case, Brinkman wasn't entitled to withhold payment of the remaining contract price. Accordingly, we conclude that sufficient evidence supported the jury's determination that Brinkman didn't substantially perform its obligations under the contract. *See Parr*, 107 P.3d at 1106; *see also Air Sols., Inc. v. Spivey*, 2023 COA 14, ¶ 9 n.2 (noting that we view in the light most favorable to the verdict the jury's "determination of the terms of the contract"). And because Ironshore failed to establish the "performance" element of its breach of contract claim, there was sufficient evidence supporting the jury's finding in favor of Pool & Spa on that claim. *See Univ. of Denver*, ¶ 46; *McDonald*, ¶ 50; *Stan Clauson Assocs., Inc.*, ¶ 9.

## C. Ironshore's Sufficiency Challenge to the Negligence Verdict

¶ 22    Ironshore next contends that there was insufficient evidence from which the jury could find that Brinkman was negligent in connection with the pool project, and accordingly, to support the jury's apportionment of 85% of the fault to Brinkman.  We again disagree.

### 1. Applicable Law

¶ 23    To prevail on a negligence claim, a "plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury."  *Day v. Johnson*, 255 P.3d 1064, 1068-69 (Colo. 2011).  However, "Colorado is a comparative negligence jurisdiction."  *Ferrer v. Okbamicael*, 2017 CO 14M, ¶ 35, *superseded by statute on other grounds*, Ch. 147, sec. 1, § 13-21-111.5(1.5)(c), 2021 Colo. Sess. Laws 863.  While comparative negligence is an affirmative defense, its purpose "is to ameliorate the harshness of the complete bar [to recovery] resulting from common law contributory negligence."  *Gordon v. Benson*, 925 P.2d 775, 777 (Colo. 1996) (quoting *Montgomery Elevator Co. v. Gordon*, 619 P.2d 66, 70 (Colo. 1980));

15

*Dickinson v. Lincoln Bldg. Corp.*, 2015 COA 170M, ¶ 25.

Accordingly, section 13-21-111(1), C.R.S. 2024, provides that a plaintiff who was negligent may nonetheless recover damages if the plaintiff's negligence was less than the negligence of the person against whom recovery is sought. But if the plaintiff's proportion of negligence was equal to or greater than the negligence of the person against whom recovery is sought, then the court must enter a judgment for the defendant. § 13-21-111(3).

### 2. There Was Sufficient Evidence to Support the Jury's Finding that Brinkman Was 85% Comparatively Negligent

¶ 24 Ironshore argues that Pool & Spa presented insufficient evidence supporting its affirmative defense that Brinkman was comparatively negligent with respect to the design and installation of the pool and spa. *See Diodosio*, 841 P.2d at 1057 ("The burden of proving an affirmative defense rests upon the defendant asserting the defense."). "And without sufficient evidence to even justify a negligence finding," Ironshore further contends, "the jury could not properly apportion 85% (or any) responsibility to Brinkman." Specifically, Ironshore asserts that Pool & Spa failed to introduce expert testimony about the duty of care that Brinkman was

16

required to exercise during the pool project, much less testimony showing that Brinkman breached that duty.

¶ 25    It's true that Pool & Spa didn't present expert testimony stating that Brinkman, in Ironshore's words, "violated industry or professional standards of care in its work regarding the swimming pool or surrounding areas." But Ironshore doesn't provide any compelling argument or authority indicating why such testimony was required under the circumstances of this case.

¶ 26    For example, Ironshore's reliance on *Holland v. Green Mountain Swim Club, Inc.*, 470 P.2d 61, 63 (Colo. App. 1970) (not published pursuant to C.A.R. 35(f)), in support of its argument is misplaced. In that case, a division of this court upheld the trial court's causation finding regarding a defective pool because that finding was supported by expert testimony. The division didn't address the applicable duty of care, let alone hold that such duty may only be proved through expert testimony as Ironshore contends. To the contrary, the division merely held that the expert testimony supported the trial court's finding.

¶ 27    Likewise, Ironshore's reliance on *BSLNI, Inc. v. Russ T. Diamonds, Inc.*, 2012 COA 214, is unavailing. In *BSLNI*, a division

of this court rejected the defendant's argument that the plaintiff was required "to prove the standard of care for concrete cutters by expert testimony because the standard of care involve[d] consideration of industry standards and other considerations that [were] technical and outside the common knowledge and experience of laypersons." *Id.* at ¶ 21. The division reasoned that "any industry standards or practices were irrelevant" because the plaintiff was asserting a breach of contract claim and the contract specified the defendant's duty of care. *Id.* at ¶ 22. However, the *BSLNI* court didn't address the issue of whether a party *must* present expert testimony to establish the duty of care involving industry standards or practices. Thus, we don't see how this case supports Ironshore's position.

¶ 28 Regardless, our review of the record reveals that there was sufficient evidence, including expert testimony, from which a reasonable juror could have concluded what the duty of care was and that Brinkman breached it. Tuck testified that as a general contractor, Brinkman's role was "to oversee the design and construction of the pool." He also testified that Brinkman was aware that a leak collection system was necessary "to reduce the

18

potential for leak-induced post-construction heave" given that the Kumar report had indicated that the soil had "potential for swell and movement, and that . . . introducing water [was] going to increase that risk." Tuck stated that Brinkman was "responsible for the pool" along with Pool & Spa and admitted that Brinkman should have compared the shop drawings with the requirements of the Kumar report.

¶ 29 Yet, as noted above, the record shows that Brinkman didn't explicitly request the leak collection system discussed in the Kumar report, and along with Worth Group, it approved the shop drawings that didn't include that system. True, the record also shows that Brinkman's project manager included the relevant portions of the report in the following email he sent to Pool & Spa's owner: "Here is the GEO tech report for the pool. I am not sure if you have seen this yet, but here it is for your reference." However, by that time, Brinkman had already signed off on the pool design that didn't provide for the leak collection system. And only three days after the email, Worth Group also approved the shop drawings without the recommended feature.

¶ 30    Kate opined that under these circumstances, Brinkman failed to satisfy its obligations in ensuring the pool had the leak collection system:

> Brinkman's primary responsibility or thing they missed was they never commissioned anybody to do the work, right. They never bid it out. They never assigned that scope of work to a contractor. They never got pricing for it. They never hired anybody to do the work, and so it never got done.

And he opined that Brinkman specifically failed to exercise reasonable care in reviewing and approving the shop drawings:

> I mean, if [Brinkman] had expected that Pool & Spa was going to do that work, then when Pool & Spa submitted those shop drawings of the work they were going to do, and there was no leak collection system there, then that would have been when Brinkman [was] supposed to say, hey, you guys, you're supposed to do this leak collection system. Go get that on these drawings before we approve them.

> But that never happened. And even after Worth Group specifically pointed to it and said, Brinkman, you need to verify that everything's cool with the geotechnical report, it still didn't happen. And so [Brinkman] missed it. They just -- they missed getting that scope of work assigned to anybody or hiring anybody to do it.

¶ 31     When viewed in the light most favorable to the verdict, the foregoing record supported the jury's finding that Brinkman was negligent in handling the pool project. *See Parr*, 107 P.3d at 1106. As a result, we necessarily reject Ironshore's claim that the jury erred by apportioning 85% percent of the fault to Brinkman. There is ample evidence in this record from which the jury could have assigned more responsibility to Brinkman than to Pool & Spa.

¶ 32     In conclusion, Ironshore's sufficiency challenge to the jury's negligence verdict fails.

### D.     Ironshore's Challenges to the Indemnity Clause Verdict Fail

¶ 33     Ironshore contends that the jury erred by determining that Pool & Spa didn't breach the indemnity clause in its contract with Brinkman because that determination lacked sufficient evidentiary support and was inconsistent with the jury's verdicts on the general breach of contract and negligence claims. We're not persuaded.

¶ 34     The indemnity clause was set forth in article 9.1.1 of the contract:

> To the fullest extent permitted by law, [Pool & Spa] shall defend, indemnify and hold harmless [Brinkman], [Brinkman's] other subcontractors, the Architect/Engineer, the

[hotel] Owner and their agents, consultants and employees (the Indemnitees) from all claims for bodily injury and property damage that may arise from the performance of the Subcontract Work to the extent of the negligence attributed to such acts or omissions by [Pool & Spa], [Pool & Spa's] subcontractors or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable.

¶ 35     In finding that Pool & Spa didn't violate this provision, the jury answered "No" to the following question in Special Verdict Form D: "Did the defendant [Pool & Spa] fail to defend, indemnify, and hold harmless . . . Brinkman . . . *for the damage attributed to [Pool & Spa]*, its subcontractors, or anyone employed directly or indirectly by any of them for whose acts any of them may be liable." (Emphasis added.)  Jury instruction #16 clarified what the italicized language above referred to by stating that for Ironshore to prevail on this claim, the jury must find, among other things, that Pool & Spa "failed to defend, indemnify, and hold harmless Brinkman for the damage attributed to Pool & Spa for its *failure to install the leak collection system*." (Emphasis added.)  The verdict form and the jury instruction together indicated that Pool & Spa's duties under the indemnity clause were triggered only to the extent Pool & Spa

22

was negligent by failing to install the leak collection system in the pool.

¶ 36     We conclude that the jury could have determined that Pool & Spa wasn't required to indemnify Brinkman for the losses related to the missing leak collection system for two reasons.  First, the jury could have found that while Pool & Spa breached the contract in some other way, it wasn't responsible for the design and installation of the leak collection system.  After all, Pool & Spa argued that point to the jury, and as noted above, it presented sufficient evidence from which the jury could have concluded that those services weren't within its scope of work.

¶ 37     Second, recall that the jury attributed 85% of the fault to Brinkman and only 15% of the fault to Pool & Spa.  That determination — which we uphold in this appeal — precluded Ironshore from recovering any damages on its negligence claims under the comparative negligence statute and the instruction that was given to the jury.  In pertinent part, the instruction provided that if the jury found that

> [Brinkman] and the defendant, [Pool & Spa],
> and [Worth Group] as [a] designated nonparty,
> were negligent and/or professionally negligent

23

and that the negligence of [Brinkman] was equal to or greater than the combined negligence of the defendant and the designated nonparty, then [Brinkman] will not be allowed to recover.

*See* § 13-21-111(1) (precluding recovery when a party's negligence was equal to or greater than the negligence of the person from whom damages are sought).

¶ 38    Therefore, the jury's comparative fault determination also could have supported its finding that Pool & Spa wasn't required to indemnify, defend, and hold Brinkman harmless.  Specifically, because the jury found that Pool & Spa didn't have to pay any damages in connection with its negligent conduct, the jury reasonably could have found that Pool & Spa didn't breach the indemnity clause by not paying Ironshore what it was entitled to recover, which was nothing.

¶ 39    Finally, for the same two reasons, we conclude that the jury's verdict on this claim wasn't inconsistent with its findings that Pool & Spa breached the contract and was 15% negligent.  Under these circumstances, then, we have no basis to disturb the jury's verdict on Ironshore's breach of the indemnity clause claim.

### E. The Jury's Award of No Damages Was Consistent with Its Other Findings

¶ 40    Ironshore contends that the jury erred by not awarding any damages because after the jury found that Pool & Spa breached the contract and was negligent in the performance of the pool project, it was required to award Ironshore damages "within the range of the evidence." Ironshore asserts that based on the evidence presented at trial, that range was from about $15,100, the amount Pool & Spa argued that Brinkman would have spent had it properly mitigated its damages, to about $647,000, the amount reflecting the total replacement costs. Ironshore argues that the jury reasonably could have awarded damages within this range and that its zero award wasn't supported by the evidence.

¶ 41    While Ironshore frames this issue as both a challenge to the sufficiency of the evidence and a challenge to the consistency of the jury's verdicts, the resolution of the issue only implicates the question of whether the jury's award of no damages was inconsistent with its findings that Pool & Spa breached the contract and was negligent. Answering that question requires us to review the jury instructions, the special verdict forms, and the evidence

that was presented to the jury in connection with Ironshore's general breach of contract and negligence claims. *See Hock*, 876 P.2d at 1259. After doing so, we conclude that the jury's verdicts on those claims weren't inconsistent.

¶ 42 The jury completed two special verdict forms with respect to Ironshore's general breach of contract claim. On Special Verdict Form C, as we note above, the jury found that Pool & Spa breached its contract with Brinkman. But the jury also found with sufficient evidentiary support that Brinkman failed to substantially perform on its obligations under the contract. After the jury made that finding, Special Verdict Form C required it to find in favor of Pool & Spa and to fill out a separate Special Verdict Form E. In turn, the latter verdict form simply stated that Ironshore wasn't entitled to a damages award.[5] Thus, the jury's award of no damages on the general breach of contract claim was consistent with its finding that Ironshore didn't prevail on that claim because Brinkman failed to substantially perform under the contract.

---

[5] Ironshore didn't object to the special verdict forms in the trial court and doesn't argue on appeal that they were improper.

¶ 43    As for the negligence claims, the jury filled out Special Verdict Form B.  It answered "Yes" to the questions about whether Pool & Spa was negligent and professionally negligent, and whether Ironshore suffered damages as a result of Pool & Spa's negligent conduct.  However, the jury also decided that Brinkman was negligent and that its negligence was "a cause . . . of [its own] damages and losses."  And the jury found Brinkman 85% at fault for those damages.  So the jury found that the total amount of Ironshore's general damages was zero.

¶ 44    This last finding is consistent with the jury's apportionment of comparative fault between the parties.  Again, the jury instruction addressing comparative negligence provided that Ironshore wouldn't be entitled to recover any damages if the jury were to determine that Ironshore's proportion of negligence was equal to or greater than the negligence of Pool & Spa.[6]  Because the jury determined that Brinkman was more negligent than Pool & Spa, there is no error in the jury also finding that Ironshore's general damages were zero dollars.  This was *consistent* with the jury instruction and the

---

[6] Ironshore also didn't object to this jury instruction at trial.

statute providing for no recovery of damages under those circumstances. *See* § 13-21-111(1); *see also City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 486 (Colo. App. 2003) ("A jury verdict will not be disturbed for inconsistency if a review of the record indicates any basis for the verdict."). Thus, we also don't discern any inconsistencies in the jury's special verdict on the negligence claims.

¶ 45    In sum, we conclude that the jury didn't err by awarding Ironshore no damages in connection with its general breach of contract and negligence claims.

### III.    Appellate Costs

¶ 46    Lastly, we grant Pool & Spa's request for appellate costs. *See* C.A.R. 39(a)(2) ("[I]f a judgment is affirmed, costs are taxed against the appellant."). Pool & Spa may pursue those costs in the trial court by following the procedure set forth in C.A.R. 39(c)(2).

### IV.    Disposition

¶ 47    The judgment is affirmed.

JUDGE WELLING and JUDGE SCHUTZ concur.